SPRINGDALE CONVALESCENT CENTER, Plaintiff-Appellee,

v.

F. David MATHEWS, Secretary of Health, Education and Welfare, et al., Defendants-Appellants.

No. 75–4199.

United States Court of Appeals, Fifth Circuit.

Jan. 20, 1977.

---

John W. Stokes, Jr., U. S. Atty., Julian M. Longley, Jr., Asst. U. S. Atty., Atlanta, Ga., Rex E. Lee, Asst. Atty. Gen., Robert E. Kopp, David M. Cohen, Judith S. Feigin, Atty., Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C., for defendants-appellants.

Charles E. Watkins, Jr., Paul Oliver, Atlanta, Ga., for plaintiff-appellee.

Before COLEMAN, CLARK and TJOFLAT, Circuit Judges.

CLARK, Circuit Judge:

The district court granted a preliminary injunction prohibiting the United States Secretary of Health, Education, and Welfare (Secretary or HEW) from suspending the Medicaid provider status of the plaintiff, Springdale Convalescent Center (Springdale), for refusing to reimburse the Secretary for alleged Medicare overpayments.[1] The court also held (a) that the

---

1. The Secretary's authority to effect suspension in such instances arises under the Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, 1396b(*l*)(2), rather than the Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* The interplay between these two Acts is significant in relation to our finding of federal jurisdiction.

Secretary exceeded his statutory authority under the Medicare Act to promulgate regulations establishing methods for determining the reasonable cost of a Medicare provider's services,[2] and (b) that the Secretary's regulation providing for the recapture of accelerated depreciation charges[3] contravened the Fifth Amendment due process clause to the United States Constitution as applied to Springdale. In their appeal defendants[4] argue that the district court was without jurisdiction of this cause, or alternatively, that the Secretary properly exercised his statutory authority and the regulation is not unconstitutional. We hold that the district court properly had jurisdiction but that the district court erred in holding that the regulation was unconstitutional.

The plaintiff is a "skilled nursing home" located in Atlanta, Georgia. On July 1, 1968, Springdale entered into an agreement with the Secretary to become a provider of services under the Medicare Program. *See* 42 U.S.C. § 1395cc. Under such agreements, a provider is prohibited from charging a patient directly for items or services provided under the Medicare Act. *Id.* § 1395cc(a)(1). The Secretary or his agent, a designated fiscal intermediary under contract with HEW, reimburses the provider for its "reasonable costs" incurred while rendering Medicare services. *Id.* § 1395h.

The "reasonable costs" reimbursed to a provider for Medicare services must be the "cost actually incurred, excluding . . . any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations [promulgated by the Secretary] establishing the method or methods to be used, and the items to be included, in determining such costs . . . ." *Id.* § 1395x(v)(1)(A). The Medicare Act specifically exhorts the Secretary

to adopt regulations that make "suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive." *Id.* § 1395x(v)(1)(A)(ii).

When Springdale became a Medicare provider on July 1, 1968, the Secretary's cost reimbursement regulations permitted providers to use either straight-line or accelerated depreciation formulae when computing compensable costs under the Medicare Act. 20 C.F.R. § 405.415 (1967). The regulations neither qualified the use of accelerated depreciation nor provided for the recapture of any portion of accelerated depreciation charges allowed to a provider. From July 1, 1968, until August 8, 1973, when it voluntarily withdrew from the Medicare Program, Springdale used an accelerated depreciation formula in depreciating its capital assets and computing its compensable Medicare costs.

On February 5, 1970, the Secretary proposed a new depreciation regulation to become effective on August 1, 1970. 35 Fed. Reg. 2593 (Feb. 5, 1970). Under this regulation providers entering the Medicare Program after the effective date of the regulation could not use accelerated depreciation formulae. The regulation also stipulated that if a provider that had been using the accelerated method of depreciation terminated its participation in the Medicare Program after August 1, 1970, the Secretary would recoup the difference between the reimbursement received by the provider, employing the accelerated method, and what it would have received had the provider used the straight-line method of depreciation.

In November of 1973, Springdale notified HEW that it no longer wished to be a provider under the Medicare Act but would

2. 42 U.S.C. § 1395x(v)(1)(A).

3. 20 C.F.R. § 405.415(3)(1975).

4. The defendants, in addition to Mr. David Mathews, Secretary of Health, Education, and Welfare, are Mr. T. M. Parham, Commissioner of the Georgia Department of Human Resources, who is responsible for administering the Medicaid program in Georgia, and The Travelers Insurance Company, who is the Secretary's agent responsible for dispensing Medicaid monies to Springdale.

continue to participate as a provider of Medicaid services. In a January 17, 1974 letter, HEW formally accepted Springdale's request to terminate noting, *inter alia,* that its termination was effective as of August 8, 1973, and that it should contact its fiscal intermediary, The Travelers Insurance Company (Travelers), "to make arrangements for completion of a final cost report and to adjust any outstanding current financing or accelerated emergency payments." From 1968 to 1973, Springdale had used an accelerated depreciation formula in computing its compensable Medicare costs. Under the regulation, it was thus subject to the recapture provision of the Secretary's depreciation regulation since it was withdrawing from the Medicare Program after the regulation's effective date. When Springdale's final cost report was completed, however, these overpayments were not withheld.

On October 16, 1974, Springdale received notice from Travelers that it owed $6,170 under the Medicare Program for its failure to comply with the Secretary's August 1, 1970 depreciation regulation. Travelers informed Springdale that the Secretary was authorized to withhold any future payments owing to Springdale as a Medicaid provider until Springdale refunded the $6,170. Travelers further informed Springdale that the payments due it under the Medicaid Act would not be offset against the alleged Medicare overpayments. On July 15, 1975, after Springdale continued to refuse to remit the amount claimed by Travelers, the Georgia Department of Human Resources (Department) notified Springdale that it was being suspended from the Medicaid Program. *See* 42 U.S.C. § 1396b(*l*)(2). The Department apprised Springdale that its Medicaid payments would cease as of September 6, 1975.

On August 14, 1975, the district court granted a temporary restraining order of the defendants' proposed action. On September 15, 1975, the district court conducted a hearing on consolidated motions for preliminary and permanent injunctions and on Springdale's motion for summary judgment. By stipulation of the parties the court limited its consideration to the issue of

whether [the Secretary's August 1, 1970 depreciation regulation was] unconstitutional as applied to [Springdale] under the due process clause of the Fifth Amendment to the United States Constitution, insofar as it authorized the government to recoup reimbursements for depreciation charges taken prior to the effective date of the amendment
.    .   ..

Finding that the Secretary exceeded his statutory authority in promulgating the disputed portion of the regulation and that it was unconstitutional, the district court permanently enjoined the defendants from withholding any Medicaid payments for any amounts claimed to be owed to HEW under the Medicare Program.

On appeal the defendants argue (1) that the federal courts are without jurisdiction to review this action under 28 U.S.C. §§ 1331, 1361 (1970), or 5 U.S.C. §§ 701 *et seq.* (1970); (2) alternatively, that the doctrine of sovereign immunity bars the instant action; and (3) assuming *arguendo* that this court has jurisdiction, that the Secretary's August 1, 1970 depreciation regulation is constitutional as applied to Springdale. We treat these arguments separately below.

## I. JURISDICTION

Without elaborating its reasons, the district court found that jurisdiction to entertain Springdale's action exists under 28 U.S.C. § 1331 (1970) since it arises under the laws of the United States and the matter in controversy exceeds $10,000. Because of the defendants' jurisdictional attack, we first examine the Medicaid Act to determine judicial review ability of this action. In this regard, the defendants seek to limit the scope of our inquiry. They argue that this suit only nominally arises under the Medicaid Act and that it should be governed solely by the principles of jurisdiction incorporated into the Medicare Act. In an attempt to buttress this argument, they

contend that the crux of this dispute involves the validity of the Secretary's Medicare regulation and the defendants' finding of alleged Medicare overpayments under the recapture portion of that regulation.

The defendants do not fashion their argument in this manner simply because our authority to review the instant action *vel non* depends upon statutory grants of jurisdiction contained in either the Medicare or the Medicaid Acts. To the contrary, for the accounting periods relevant to this case, neither Act expressly authorizes judicial review of provider reimbursement determinations.[5] Rather the defendants urge us to look solely to the principles of jurisdiction incorporated into the Medicare Act because of the implications this might possibly have upon our "nonstatutory," and especially here, federal question jurisdiction under 28 U.S.C. § 1331 (1970).

The Medicare Act *vis-à-vis* the Medicaid Act incorporates by reference the following provision of the Social Security Act:

> The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under [28 U.S.C. § 1331, *inter alia*] to recover on any claim arising under this subchapter.

42 U.S.C. § 405(h), *incorporated in id.* § 1395ii. When section 405(h) was initially construed, the courts held that when a federal act established a statutory grant of jurisdiction for review of the Secretary's decision, the federal courts could not review that decision by any other means, but that when the federal act did not provide such a jurisdictional grant, section 405(h) did not

prohibit a plaintiff from invoking federal question jurisdiction. *E.g., Kingsbrook Jewish Medical Center v. Richardson*, 486 F.2d 663, 666–67 (2d Cir. 1973). The United States Supreme Court, in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 2462–65, 45 L.Ed.2d 522 (1975), changed that interpretation of section 405(h), to preclude persons from asserting federal question jurisdiction when seeking review of the Secretary's denial of social security insurance benefits under the Social Security Act. *Salfi* did not bar access of the individual plaintiffs in that case to the federal court, however, because 42 U.S.C. § 405(g), another section of the Social Security Act, authorized judicial review. *Id.* at 761–65, 95 S.Ct. at 2465–66. Section 405(g) is unavailing to Springdale, however, since, as incorporated into the Medicare Act, it governs provider eligibility and termination claims only and not cost reimbursement disputes. 42 U.S.C. § 1395ff(c); *see* note 5 ·*supra*. Defendants argue that upon applying "Medicare review principles" to this action, *Salfi* necessarily forces us to conclude that Section 405(h) forecloses the exercise of our federal question jurisdiction.

This court has had the opportunity to discuss the impact of Salfi's construction of Section 405(h) on four occasions. All four decisions, however, pretermitted a discussion of whether Section 405(h) precludes federal question jurisdiction over constitutional challenges to the Social Security Act (of which the Medicare Act is a subchapter) and the regulations of the Secretary promulgated under the Act. In each case we found that an alternative jurisdictional basis for review, other than our federal question jurisdiction, was present. *Ortego v. Weinberger*, 516 F.2d 1005, 1007–15 (5th Cir. 1975) (jurisdiction exists under 5 U.S.C. §§ 701 *et seq.*), *followed, Lejeune v. Mathews*, 526 F.2d 950, 952–53 (5th Cir. 1976);

---

5. Medicare provider reimbursement disputes involving $10,000 or more for accounting periods ending on or after June 30, 1973, are now reviewable under the Act. 42 U.S.C.A. § 1395 oo(f) (Cum.Supp.1976). The instant action pertains only to reimbursements received by Springdale during the fiscal years 1968 to 1971.

During these periods the Act provided for review of the Secretary's determinations that an institution was not qualified to be a provider of services and that a once qualified provider was no longer eligible to maintain its provider status. 42 U.S.C. § 1395ff(c)

*Dr. John T. MacDonald Foundation, Inc. v. Mathews,* 534 F.2d 633, 634–36 (5th Cir. 1976); *Gallo v. Mathews,* 538 F.2d 1148 (5th Cir. 1976). Other courts, in Section 405(h) cases, have also found that alternative jurisdictional bases existed to review constitutional and nonconstitutional challenges under the Social Security Act and its correlative regulations. *Hazelwood Chronic & Convalescent Hospital, Inc. v. Weinberger,* 543 F.2d 703, 706–07 (9th Cir. 1976), *following Rothman v. Hospital Service,* 510 F.2d 956, 958–69 (9th Cir. 1975) (jurisdiction exists under 5 U.S.C. §§ 701 *et seq.* (1970)); *South Windsor Convalescent Home, Inc. v. Mathews,* 541 F.2d 910 (2d Cir. 1976) (exclusive jurisdiction lies in the United States Court of Claims under 28 U.S.C. §§ 1361, 1491 (1970)); *St. Louis University v. Blue Cross Hospital Service,* 537 F.2d 283, 292 (8th Cir. 1976) (jurisdiction to review Medicare Act constitutional challenges only exists under 28 U.S.C. § 1331 (1970)); *Whitecliff, Inc. v. United States,* 536 F.2d 347, 349–51 (Ct.Cl.1976) (jurisdiction exists under 28 U.S.C. § 1491 (1970)); *Ryan v. Shea,* 525 F.2d 268, 271–72 (10th Cir. 1975) (jurisdiction exists under 5 U.S.C. §§ 701 *et seq.* and 28 U.S.C. § 1361 (1970)); *Sanders v. Weinberger,* 522 F.2d 1167 (7th Cir. 1975), *cert. granted,* 427 U.S. 911, 96 S.Ct. 3197, 49 L.Ed.2d 1202 (1975) (jurisdiction exists under 5 U.S.C. §§ 701 *et seq.* (1970)).

The instant case does not require that we decide whether *Salfi's* social security construction of Section 405(h) forecloses our consideration of Springdale's constitutional challenge to the Secretary's Medicare depreciation regulation. Central to the resolution of this jurisdictional issue is our determination that Springdale's action falls under the Medicaid rather than the Medicare Act. Accordingly, since the Medicaid Act does not incorporate Section 405(h), we are not precluded from exercising our federal question jurisdiction over this suit.

Defendants' own actions compel this result. When the Secretary formally accepted Springdale's resignation as a Medicare provider on January 17, 1974, Travelers, the Secretary's fiscal intermediary, held monies owing to Springdale for its services as a Medicare provider. Any Medicare monies allegedly owing to HEW as the result of Springdale's resignation could have been withheld from Springdale at that time. The defendants were apparently asleep at the switch, however, and no such withholding was made in the final adjustment of Springdale's Medicare account. On October 16, 1974, when Travelers notified Springdale that it claimed Medicare overpayments, the only monies held by Travelers were sums properly due Springdale for services provided under the Medicaid Act.

Travelers informed Springdale that the Secretary possessed the statutory authority to withhold payments owing to Springdale as a Medicaid provider for the alleged Medicare overpayments and that these Medicaid monies would not be used to offset those overpayments. Statutory authority for suspension exists under the Medicaid rather than the Medicare Act. Again, since the Medicaid Act does not incorporate 42 U.S.C. 405(h), we are not precluded from deciding whether our federal question jurisdiction empowers us to review Springdale's claim. In reaching our conclusion, we do not suggest that the Secretary is being penalized for exercising his statutory authority under the Medicaid Act. We merely recognize that the Congress by not incorporating 42 U.S.C. § 405(h) into the Medicaid Act has refused to insulate the Secretary's exercise of statutory authority under that Act from judicial review. Thus, consideration of Section 405(h)'s effect upon our federal question jurisdiction in this action is unnecessary.

The Medicaid Act does not provide a statutory grant of jurisdiction for the review of this action. We are not precluded from finding, however, that "nonstatutory" jurisdiction to review is available. *Ortego v. Weinberger,* 516 F.2d 1005, 1009 (5th Cir. 1975). Since Springdale's constitutional challenge to the Secretary's depreciation regulation arises under the laws of the United States, *e.g., Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 901–10, 47 L.Ed.2d 18 (1976), and since the matter in

controversy, which encompasses $6,170 in alleged Medicare payments and Springdale's right to continue to receive Medicaid payments in the future, exceeds $10,000, *see Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 1230 n.10, 43 L.Ed.2d 514 (1975), we are clearly presented with a case falling within our federal question jurisdiction.

■ Nonetheless, defendants argue that even if this action is controlled by Medicaid "review principles," this court remains without jurisdiction because the doctrine of sovereign immunity bars the suit. Defendants present us with alternative contentions in regard to this argument. First they point out that the Secretary retains the common law right to recoup Medicare monies improperly paid to Springdale. *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger,* 517 F.2d 329 (5th Cir. 1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976). Defendants contend that Springdale's attempt to enjoin the Secretary from exercising this right is subject to the bar of sovereign immunity. This argument fails. While defendants correctly point out that the Secretary has the authority to recoup Medicare overpayments, *Mount Sinai Hospital of Greater Miami, Inc., supra,* this is not the right the Secretary exercised. Rather the Secretary withheld Medicaid payments validly due to Springdale and terminated its status as a Medicaid provider on the basis of the allegedly unconstitutional regulation.

Alternatively, defendants contend that even viewing Springdale's action in the correct manner, sovereign immunity bars the suit since in essence Springdale seeks to compel the Secretary to expend funds from the United States Treasury in an action to which the United States has not consented. *E.g., United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Consideration of this contention as it applies to the instant action requires us to examine the Medicaid Program and how it is funded.

The Medicaid Program provides medical assistance for the aged, the blind, the disabled, families with dependent children, and other persons with insufficient resources to meet the cost of necessary medical services. If a state wishes to participate under the Medicaid program, it must submit to HEW a medical assistance plan that conforms with uniform requirements set forth under the Medicaid Act. 42 U.S.C. § 1396a. Upon HEW approval of the state's plan, HEW provides federal matching funds to the participating state, with a state agency administering the Medicaid program and reimbursing Medicaid providers for the costs of their services provided under the Medicaid Act. The federal matching funds are annually appropriated by the Congress, and it has mandated that the Secretary shall pay the sums allocated to each participating state under a prescribed statutory formula. 42 U.S.C. § 1396b.

Defendants argue that in seeking to enjoin the Secretary from exercising his statutory authority to suspend Springdale's medicaid provider status under 42 U.S.C. § 1396b(*l*)(2), Springdale seeks to compel the Secretary to expend funds, in the form of reimbursement for Medicaid expenditures, from the United States Treasury. Defendants claim that such actions are barred by the doctrine of sovereign immunity, even when as here, the federal officer's actions are based upon an allegedly unconstitutional statute or regulation. *Mine Safety Appliances Co. v. Forrestal,* 326 U.S. 371, 66 S.Ct. 219, 90 L.Ed. 140 (1945); *accord, Sprouse v. Federal Prison Industries, Inc.,* 480 F.2d 1 (5th Cir. 1973); *Zapata v. Smith,* 437 F.2d 1024 (5th Cir. 1971).

■ Springdale merely seeks funds, however, that the Congress has already appropriated for disbursal under the Medicaid Program rather than any monies which the Secretary would be compelled to expend from the United States Treasury without the Federal Government's consent. In appropriating these funds Congress has directed that they be used by the Secretary to fulfill his statutory obligations and achieve the declared purposes of the Medicaid Act. An action to compel a federal officer to distribute an annual appropriation made by Congress, as here, is not barred by sovereign immunity. *See Train v. City of New*

*York,* 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975); *National Council of Community Health Centers, Inc. v. Weinberger,* 361 F.Supp. 897 (D.D.C.1973). Springdale is admittedly entitled to a portion of these appropriated funds for its services performed as a Medicaid provider unless the Secretary determines, *inter alia,* that it has received overpayments under the Medicare Program. Here the basis of the Secretary's determination is a regulation that Springdale attacks as being in contravention of the due process clause of the Fifth Amendment to the United States Constitution. A suit to enjoin a federal officer from acting in an unconstitutional manner is not barred by sovereign immunity, and the defendants' actions are reviewable in the federal courts. *Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); *Alabama Rural Fire Ins. Co. v. Naylor,* 530 F.2d 1221 (5th Cir. 1976).

## II. THE REGULATION

### A. Statutory Authority

The district court found that while the Secretary clearly had the authority to make corrective retroactive adjustments under section 1395x(v)(1)(A)(ii),[6] the adjustments must be limited by virtue of section 1395g, to the single prior fiscal period in which the retroactive regulation is adopted and cannot be applied to reopen prior annual audits. Since 20 C.F.R. § 405.415(3) (1975) provides for recoupment of reimbursements for the fiscal accounting periods 1968–1971, which was beyond Springdale's immediate prior audit, and indeed, to the date that it entered the Medicare Program, the district court held that the Secretary had exceeded his statutory authority in promulgating the regulation.

We will first examine the Secretary's statutory grant of authority to promulgate regulations establishing methods of cost reimbursement and procedures for payment. Then we will determine whether regulation 405.415(3) is a reasonable exercise of the Secretary's statutory authority and, if so, whether the Secretary may reopen final audits of a provider and apply the regulation retroactively beyond a provider's current fiscal period.

Section 1395f(b) specifies that providers are to be reimbursed for the reasonable costs of services rendered to Medicare beneficiaries. The precise methods to be used in determining how much a provider is to be reimbursed for its services, triggered a great deal of Congressional debate and delayed passage of the Act for more than a decade. *See* S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* [1965] U.S.Code Cong. & Ad.News 1943, 1976. Congress ultimately chose not to specify any rigid formulae. Rather it established general statutory guidelines under section 1395x(v)(1)(A) and authorized the Secretary to "prescribe such regulations as may be necessary to carry out the administration of the [Act] . . ." 42 U.S.C. § 1395hh. The validity of the Secretary's regulations "will be sustained so long as [they are] 'reasonably related to the purposes of the enabling legislation' . . . ." *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973), *quoting Thorpe v. Housing Authority,* 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969); *followed, Florida v. Mathews,* 526 F.2d 319, 323–24 (5th Cir. 1976); *Johnson's Professional Nursing Home v. Weinberger,* 490 F.2d 841, 844 (5th Cir. 1974). Because the Secretary's interpretation of the statutory scheme is entitled to "considerable deference," *Florida v. Mathews,* 526 F.2d at 323 n. 10, Springdale has the "difficult burden" of proving that the Secretary's regulation conflicts with the statutory scheme. *Id.* at 323. This has also been described as a "heavy burden." *Johnson's Professional Nursing Home v. Weinberger,* 490 F.2d at 844.

Section 1395x(v) accords to the Secretary broad authority in prescribing the methods

---

**6.** Hereinafter, all sections refer to those in the Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*

to be used in determining a provider's reasonable costs.[7] Nevertheless, the Secretary's discretion is not unfettered. Each cost reimbursement regulation must approximate as closely as is practicable the direct and indirect costs of rendering services only to persons covered by the Act. 42 U.S.C. § 1395x(v)(1)(A)(i); 20 C.F.R. § 405.-402 (1975); *see* S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* [1965] U.S.Code Cong. & Ad.News 1943, 1976. Furthermore, whenever the Secretary determines that a prescribed method of cost reimbursement results in inadequate reimbursement or overpayment to providers, the Secretary is to make suitable retroactive corrective adjustments to rectify the situation. 42 U.S.C. § 1395x(v)(1)(A)(ii). The Secretary has established detailed methods of cost reimbursement under Section 1395x(v)(1)(A). *E.g.*, 20 C.F.R. §§ 405.401–.453 (1975).

The reasonable cost of a provider's services is determined by the Secretary at the end of each fiscal year. Recognizing that annual payments made long after services are rendered would fail to satisfy a provider's liquidity needs, Congress has mandated, under section 1395g, that the Secretary reimburse providers at least monthly, with subsequent adjustments for overpayments and underpayments to be made prior to the final audit for the fiscal year.[8] The Secre-

tary has also promulgated extensive regulations establishing payment procedures for reimbursing providers for their services rendered throughout the fiscal year. *E.g.*, 20 C.F.R. §§ 405.250, 405.454 (1975).

To date we have interpreted the provisions involved here only once. In *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger*, 517 F.2d 329, 334–36 (5th Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976), we observed that the providing of services to Medicare beneficiaries raised two important but distinct issues: (1) whether services provided are covered under the Act; and (2) whether the amount paid for the covered services is their reasonable cost. There we were presented with the question, *inter alia*, of whether section 1395g authorized the Secretary to recoup payments made for services subsequently determined by the Secretary not to be covered by the Act. After noting that both sections 1395x(v)(1)(A)(ii) and 1395g contemplate making corrective adjustments for improper payments of Medicare monies, we determined that, because the language of the two statutes tracked each other so closely, and section 1395g related only to cost as opposed to coverage determinations, the statutes did not establish a right of recoupment. Our decision there, which was concerned primarily with

---

7. 42 U.S.C. § 1395x(v)(1)(A) provides in pertinent part:

> The reasonable cost of any services shall be the cost actually incurred . . . and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types of classes of institutions, agencies, and services. . . . Such regulations shall (i) take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of

determining costs proves to be either inadequate or excessive.

8. 42 U.S.C. § 1395g provides:

> The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit or settlement by the General Accounting Office, from the Federal Hospital Insurance Trust Fund, the amounts so determined, with necessary adjustments on account of previously made overpayments or underpayments; except that no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.

issues of coverage *vis-à-vis* cost determinations, has no relation to our inquiry today.[9] Here the question turns upon the proper analysis of the Act's bifurcated cost reimbursement structure, the nature and scope of the corrective adjustments appropriate to sections 1395g and 1395x(v)(1)(A), and the proper exercise of the Secretary's authority to promulgate regulations in furtherance of the statutory cost reimbursement scheme.

In promulgating regulations defining the methods of determining reasonable costs, the Secretary has always recognized that depreciation represents a cost of services. This is essential since capital assets are consumed in the production or rendering of services. Initially the Secretary permitted the use of either straight-line depreciation or one of two types of accelerated depreciation in determining the cost of capital consumed by a provider when rendering services to Medicare beneficiaries. 20 C.F.R. § 405.415 (1967).

Straight-line depreciation requires an even allocation of the cost of a capital asset, less its salvage value, over its useful life. Although the net effect is the same as with straight-line depreciation, accelerated depreciation formulae allocate more of the cost of a capital asset to the early years of its useful life rather than requiring the allocation of the same amount each year. Broadly speaking, the principal purpose of permitting accelerated methods of depreciation under the Federal tax laws is to stimulate investment. The Secretary admits that accelerated depreciation was initially permitted under the Medicare Act to encourage providers to come into the program by allowing generous depreciation amounts which would facilitate replacement costs or the mortgage payments on long term assets.

The use of accelerated depreciation when determining the cost of providing Medicare services permits greater reimbursements to providers in the early years of the useful life of an asset (since greater depreciation charges meant greater costs chargeable to the program). If a provider remains in the program for the life of an asset, however, no ultimate increase in reimbursement results. On the other hand, should a provider using accelerated depreciation decide to leave the program before the useful life of its capital assets terminates, the provider receives a greater total reimbursement than it would have received had it used straight-line depreciation for the same period. The net effect of this early departure may be that charges to non-Medicare patients are kept lower, at the expense of the Medicare program. This result directly conflicts with section 1395x(v)(1)(A)(i)'s mandate that the costs of services to persons not covered will not be borne by the Act.

At some time prior to February 5, 1970, the Secretary recognized that the use of accelerated depreciation could result in excessive payments to a provider who left the Medicare Program before the useful life of its capital assets ended. On February 5, 1970, the Secretary published a proposed regulation which would amend the then existing depreciation regulation. 35 Fed.Reg. 2593 (Feb. 5, 1970). The proposal made the following changes in the treatment of accelerated depreciation: (a) Nursing homes certified after August 1, 1970 could not use the accelerated method of calculating depreciation costs. (b) Providers already participating could not use the accelerated method of calculating depreciation costs for newly acquired capital assets. (c) With respect to capital assets for which the accelerated method of depreciation had been used prior to August 1, 1970, the accelerated method of calculating depreciation costs could con-

**9.** In *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger*, 376 F.Supp. 1099, 1129 (S.D.Fla.1974), the district court concluded, *inter alia*, that the retroactive cost adjustment procedure authorized under section 1395x(v)(1)(A)(ii) is limited to the making of adjustments for a single fiscal period. This question was not before us on appeal in that case. To the extent that our opinion might be interpreted as approving the district court's conclusion on this particular point, *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger*, 517 F.2d 329, 335 (5th Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976), such an interpretation would be based on dictum.

tinue to be used. (d) If a provider terminated its participation after August 1, 1970, the Secretary could recover all costs paid to the terminated provider resulting from accelerated depreciation which were in excess of what would have been paid if straight-line depreciation had been used. These proposed amendments became effective nearly 6 months later. 35 Fed.Reg. 12330 (Aug. 1, 1970).

■ Upon determining that one of his cost reimbursement regulations produces inadequate or excessive payments to providers, the Secretary has a statutory duty to make suitable retroactive corrective adjustments. *Id.* § 1395x(v)(1)(A)(ii); *Hazelwood Chronic & Convalescent Hospital, Inc. v. Weinberger*, 543 F.2d 703, 708 (9th Cir. 1976); *Whitecliff, Inc. v. United States*, 536 F.2d 347, 351–52 (Ct.Cl.1976); *Kingsbrook Jewish Medical Center v. Richardson*, 486 F.2d 663, 669–70 (2d Cir. 1973). Thus, in adopting the proposed amendment, the Secretary was properly attempting to ensure that reimbursement to providers of services would be limited to payment for services rendered to Medicare beneficiaries and to provide for the recapture of any excessive payments made under the previous depreciation regulation.

■ Springdale argues, however, that the Secretary's authority to make "suitable retroactive corrective adjustments . . for a provider of services for any fiscal period" under section 1395x(v)(1)(A)(ii) is limited to a single prior fiscal period, by virtue of section 1395g. Defendants argue that the determination of a suitable retroactive period is left to the discretion of the Secretary.

The Medicare Act contemplates a bifurcated structure in relation to cost determinations. The Secretary is authorized to establish (1) interim procedures for paying a provider during the fiscal year under section 1395g and (2) methods for determining the reasonable costs of a provider's services under section 1395x(v)(1)(A). Pursuant to this authority, the Secretary has adopted regulations consistent with this bifurcated scheme. *Kingsbrook Jewish Medical Center v. Richardson*, 486 F.2d at 669–70.

Section 1395g establishes an interim payment procedure with necessary adjustments for previously made overpayments or underpayments. The methods for determining a provider's reasonable cost authorized under section 1395x(v)(1)(A) are designed to compute correctly a provider's reimbursable costs, a function completely different from the interim payment procedure of section 1395g. *Whitecliff, Inc. v. United States*, 536 F.2d at 352–53. Any corrective adjustments made under section 1395g are to be made "prior to the [provider's] final audit or settlement." The suitable retroactive corrective adjustments contemplated under section 1395x(v)(1)(A)(ii) are to be made "for *any fiscal period* [in which] the aggregate reimbursement produced by *the methods of determining costs* proves to be either inadequate or excessive. (Emphasis supplied.)" Not only does this "descriptive duality" suggest that the corrective adjustments made under the two sections are to be treated differently, *Kingsbrook Jewish Medical Center v. Richardson*, 486 F.2d at 670, but the statutory term "any fiscal period" more aptly denotes "the time span over which an inadequate or excessive reimbursement may have occurred" rather than "a limitation on the time in which the Secretary may initiate an adjustment." *Hazelwood Chronic & Convalescent Hospital, Inc. v. Weinberger*, 543 F.2d at 708. Moreover, limiting the scope of the Secretary's mandate to make suitable retroactive corrective adjustments to a provider's unsettled audits is at loggerheads with Congress' express directive that (i) the costs of services to Medicare beneficiaries will not be borne by persons not covered by the Act and (ii) the costs with respect to persons not so covered will not be borne by the Act.

■ The statutory scheme expressly authorizes the Secretary to formulate regulations implementing interim procedures for payment and methods of cost reimbursement. In promulgating regulation 405.-415(3), the Secretary has determined that retroactive adjustments should not be limit-

ed to a provider's nonfinal, unsettled audit. The Secretary's determination is the result of the exercise of his economic judgment in an area committed to his expertise. We refuse to substitute our judgment for that of the Secretary, *Johnson's Professional Nursing Home v. Weinberger,* 490 F.2d at 844–45, especially when as here the depreciation regulation fulfills an explicit congressional statutory directive. Accordingly, the Secretary did not exceed his statutory authority in promulgating the instant regulation. *Hazelwood Chronic & Convalescent Hospital, Inc. v. Weinberger,* 543 F.2d 703, 707–08 (9th Cir., 1976); *see Whitecliff, Inc. v. United States,* 536 F.2d 347 (Ct.Cl.1976); *Florida v. Mathews,* 526 F.2d 319 (5th Cir. 1976); *Johnson's Professional Nursing Home v. Weinberger,* 490 F.2d 841 (5th Cir. 1974); *Kingsbrook Jewish Medical Center v. Richardson,* 486 F.2d 663 (2d Cir. 1973).

### B. Constitutionality

The district court also determined that regulation 405.415(3) contravened the Fifth Amendment due process clause to the United States Constitution in that it permitted "the government to appropriate *ex post facto* [Springdale's] earned and vested property right." In urging us to affirm the district court's finding, Springdale also argues that the retroactive portion of the Secretary's depreciation regulation is an *ex post facto* regulation and an interference with Springdale's vested property rights prohibited by the Fifth Amendment.

Springdale urges the reasonableness of the Secretary's original regulation, and its attractiveness, indeed its necessity, to providers initially entering the Medicare Program. By characterizing his amended regulation as an attempt "to renege and pay less" for providers' services, Springdale apparently argues that it changed its position in reliance upon the original regulation and that the regulation as amended defeats the reasonable expectations of the parties.

■ Because the Secretary's amended regulation provides that different accounting concepts attaching new legal obligations be applied to already completed trans-

actions, it is retroactive in its application. To be upheld, however, the regulation must withstand scrutiny under the due process clause of the Fifth Amendment. "[The] burden is on one complaining of a due process violation to establish that the [Secretary] has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976).

■ Congressional legislation or regulations adopted pursuant thereto, whether prospective or retrospective in application, often have economic consequences which may be inconsistent with a party's reasonable expectations. Such inconsistencies are not equivalent to unconstitutionality as to prospective or retroactive enactments. The Secretary's regulation is valid if it has a rational basis. *See id.* at 2893.

As discussed earlier, providers that used accelerated depreciation methods and subsequently left the Medicare Program before the useful life of their capital assets ended, would receive depreciation allowances that exceeded the pro rata exhaustion of their capital assets. Upon recognizing this, the Secretary amended regulation 405.415 to permit the use of straight-line depreciation only. The regulation as amended allowed those Medicare providers that had used accelerated depreciation to continue doing so, provided they continued this method until the termination of the useful life of the asset. This return to the straight-line method combined with a qualified right to complete an accelerated depreciation schedule already undertaken, complied with the Secretary's statutory directive to correct cost reimbursement methods that result in inadequate or excessive payments.

Describing the amended regulation as an attempt to "renege or pay less" for a provider's services, as Springdale does here, disregards the Secretary's statutory obligation to promulgate regulations ensuring that the costs of services to non-Medicare patients will not be borne by the Act. While the Secretary's original depreciation regulation may have appeared to be reason-

able, it is inconsistent with this principle. The monies Springdale received from being able to use accelerated depreciation that are over and above what it would have received by using straight-line depreciation are a windfall to Springdale, accruing from the Secretary's originally defective depreciation regulation. If the Secretary had initially adopted a depreciation regulation consistent with the Act's broad statutory guidelines, Springdale would never have received this windfall. "Where the asserted vested right, not being linked to any substantial equity, arises from the mistake of officers purporting to administer the law in the name of the Government, the [Secretary] is not prevented from curing the defect in administration . . . ." *Graham v. Goodcell*, 282 U.S. 409, 429, 51 S.Ct. 186, 75 L.Ed. 415 (1931); *see Paramino Lumber Co. v. Marshall*, 309 U.S. 370, 60 S.Ct. 600, 84 L.Ed. 814 (1940); *cf. Hazelwood Chronic & Convalescent Hospital, Inc. v. Weinberger*, 543 F.2d at 708. The Congress has charged the Secretary with the duty of making suitable corrective retroactive adjustments in such instances. Springdale "cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Federal Housing Administration v. Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958).

The retroactive portion of the Secretary's regulation is narrowly drawn. It applies only in those instances in which a provider receives overpayments under the Act, *i. e.*, upon retiring from the Medicare Program prior to the termination of the useful life of the provider's capital assets. Had Springdale remained in the Medicare Program until its assets had been fully depreciated, no overpayment could have been claimed and none would have occurred since it would have ultimately received the same amount of payments from using accelerated depreciation as if it had used straight-line depreciation.

Furthermore, the record does not show that Springdale could not have left the Medicare Program during the 6-month period between announcement of the regu-

lation and its effective date had it wished to. By voluntarily leaving the program prior to the effective date of the regulation, Springdale could have retained any monies accrued to it under the original regulation without facing the consequences of the amended regulation. Rather, Springdale did not choose to leave the program until more than 2 years after the regulation's effective date. Thus we reject any notion that the Secretary's corrective action left Springdale with no choice but to forfeit the advantage it had gained under the prior regulation. *See Hazelwood Chronic & Convalescent Hospital, Inc. v. Weinberger*, 543 F.2d at 708.

The Secretary has a statutory obligation to protect the Federal Hospital Insurance Trust Fund from which Medicare monies are disbursed. Congress has directed the Secretary to ensure that the methods of cost reimbursement utilized will go to pay only for the costs of services provided to Medicare beneficiaries. The Secretary's amended regulation is rationally related to this purpose. *See Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 2471, 45 L.Ed.2d 522 (1975); *Florida v. Mathews*, 526 F.2d 319, 325 (5th Cir. 1976). Whether another regulation "would have been wiser or more practical under the circumstances is not a question of constitutional dimensions." *Usery v. Turner Elkhorn Mining Co.*, 96 S.Ct. at 2894.

Springdale also argues that this case is analogous to *Coe v. Secretary of Health, Education & Welfare*, 502 F.2d 1337 (1974), in which the United States Court of Appeals for the Fourth Circuit refused to interpret an amended regulation as being retroactively applicable when to do so would have deprived the claimant of benefits under the Medicare Act. A court ordinarily will apply the law in effect at the time it renders its decision. It may refuse to do so, however, when to apply newly enacted legislation to events preceding the legislation would result in manifest injustice. *Bradley v. School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). In such instances the court is called on to

interpret whether the legislature intended that the statute apply retroactively. These same principles hold true for administrative regulations, *Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621–22, 11 L.Ed.2d 576 (1946), but are unavailing to Springdale here. There is no issue as to whether the regulation should apply retroactively to Springdale. The Secretary has expressly made that determination. Our inquiry is limited to whether or not the retroactive regulation adopted is constitutional.

The district court's order is vacated and remanded for further proceedings not inconsistent with this opinion.

VACATED AND REMANDED.