**MASON GENERAL HOSPITAL; Edward W. Sparrow Hospital; Mary Free Bed Hospital; Oaklawn Hospital; Community Health Center; and St. Francis Hospital, Plaintiffs-Appellants,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES; Carolyn K. Davis, Adm'r., Health Care Financing Admin., Defendants-Appellees.**

No. 86–1011.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 18, 1986.

Decided Jan. 21, 1987.

Chris Rossman, David A. Ettinger, Todd B. Adams, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., William G. Christopher, argued, Kenneth R. Marcus, for plaintiffs-appellants.

Stuart M. Gerson/Wm. G. Kopit, David H. Larry, Washington, D.C., for amicus curiae.

Martin F. Palus, Asst. U.S. Atty., Grand Rapids, Mich., Ann T. Hunsaker, Asst. Gen. Counsel, Dept. of H.H.S., Edgar C. Morrison, Jr., argued, Washington, D.C., for defendants-appellees.

Before KEITH and GUY, Circuit Judges and EDGAR, District Judge.*

RALPH B. GUY JR., Circuit Judge.

This case represents one of a long line of cases challenging the promulgation by the Secretary of Health and Human Services of the 1979 Medicare Malpractice Rule, 42 C.F.R. § 405.452(b)(1)(ii) (subsequently renumbered § 405.452(a)(1)(ii) (1985)) (the 1979 Rule). The procedural history set forth below is complicated but important to our resolution of the issues on appeal.

On March 28, 1983, plaintiff hospitals (the hospitals) filed suit in the district court alleging that the 1979 Rule was substantively invalid under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), as arbitrary, capricious, and an abuse of the Secretary's discretion. They further requested a declaration that the Secretary had illegally applied the 1979 Rule in determining the hospitals' Medicare reimbursement for its 1980 fiscal year and asked that the hospitals be awarded the sums which would have been due to them under the prior rule which had been in effect since passage of the Medicare reimbursement regulations in 1966. 31 Fed.Reg. 14,808.

By judgment dated November 4, 1985, the district court granted the hospitals' motion for summary judgment, concluding that the Secretary's promulgation of the 1979 Malpractice Rule (1) was arbitrary and capricious and an abuse of discretion, and (2) violated certain provisions of the Medicare Act. However, instead of awarding the requested relief, the court remanded the case to the Secretary, stating as follows:

> The Court notes that the Secretary is currently working on a proposed regula-

tion that will replace the current malpractice rule. The Secretary proposes that this regulation will be applied retroactively to July 1, 1979. Because of this retroactivity, this case is remanded without prejudice to the Provider Reimbursement Review Board for proceedings consistent with this opinion. The Provider Reimbursement Review Board will apply such new regulations as effectively promulgated by the Secretary.

The referenced "proposed regulation" had been published on June 17, 1985, and was in substance virtually identical to the prior 1979 Rule.[1] The Secretary was, at that time, accepting comment on the proposed rule pursuant to section 553(b) of the APA preparatory to publication of the rule in final form.

On December 23, 1985, the hospitals appealed from that part of the district court judgment remanding the case to the Provider Reimbursement Review Board (PRRB). Three weeks later, on January 15, 1986, this court issued its decision in *Cumberland Medical Center v. Secretary of HHS*, 781 F.2d 536 (6th Cir.1986), striking down the 1979 Malpractice Rule as arbitrary and capricious in violation of the Medicare Act. We also resolved the issue of the appropriate relief to be granted to the successful plaintiff hospitals. Although we noted that the Secretary's proposed rule was scheduled to be effective retroactively to 1979, we declined to order remand for application of that rule when finalized.

Finally, we note that the proposed regulation is nearly identical to the current Malpractice Rule. Withholding reimbursement under these circumstances would have the undesirable effect of allowing the Secretary a second chance to establish a proper record for the Malpractice Rule, delaying indefinitely the hospitals' right to payment. If the Secretary does indeed pass a valid retroactive regulation, her right to seek adjust-

---

* Honorable R. Allan Edgar, United States District Court, Eastern District of Tennessee, sitting by designation.

1. 50 Fed.Reg. 25,178 (Monday, June 17, 1985).

ments will not be affected by our order that reimbursements under the prior regulation be made now.

*Id.* at 539.[2] In so ruling, we joined the five other circuits which had considered the issue of the *relief* to be granted and held that, upon invalidation of the 1979 Rule, the prior method of reimbursement is reinstated until replaced by a valid new regulation. *See, e.g., Abington Memorial Hospital v. Heckler,* 750 F.2d 242, 244 (3d Cir. 1985); *Menorah Medical Center v. Heckler,* 768 F.2d 292, 297 (8th Cir.1985). *See also Action on Smoking and Health v. CAB,* 713 F.2d 795, 797 (D.C.Cir.1983) (recognizing that vacating or rescinding invalidly promulgated regulations has the effect of reinstating prior regulations). This action is also in accord with our statutory authority under the APA, 5 U.S.C. § 706(2) (1982) ("The reviewing court shall ... hold unlawful and *set aside* agency action....") (emphasis added). Thus, the case was remanded to the district court with orders that the hospitals be reimbursed, with interest, under the formula set forth in the prior regulation. *Cumberland,* 781 F.2d at 539. Subsequently, and during the period that this case was being briefed before this court, the Secretary reissued the proposed regulation as an interim final rule, published on April 1, 1986, with an effective date of May 1, 1986. 51 Fed.Reg. 11,142 (April 1, 1986). This rule, however, specifies that it is applicable to cost reporting periods beginning on or after July 1, 1979, precisely the same period as was formerly governed by the invalidated 1979 Rule. *Id.* The court has received additional briefing on these recent developments, wherein the Secretary now argues that this action has been mooted by the promulgation of the April 1, 1986, rule (the 1986 Rule), since this rule, by its terms, automatically ap-

plies to these plaintiffs. Additionally, the Secretary contends that he clearly has the statutory authority to engage in the type of retroactive rulemaking at issue in this case and that the 1986 Rule is both substantively and procedurally valid under the APA and the Medicare Act. In rebuttal, the hospitals argue that the Secretary lacks the power under the Medicare Act to promulgate the 1986 Rule retroactively or that, even if he possesses such power, the 1986 Rule should not be applied under the facts of this case. Further, plaintiffs argue that the action is not moot and that the 1986 Rule is also invalid since it was not properly promulgated pursuant to APA notice and comment requirements.

As we view the case in its present posture, its resolution hinges on the determination of only one crucial issue: whether the 1986 Rule can validly be applied retroactively to hospital cost reporting periods beginning on July 1, 1979, a period of almost seven years prior to the Rule's effective date of May 1, 1986. This was the question we specifically left open in *Cumberland,* and which we resolve today in holding that, under the circumstances presented here, the Secretary is prohibited from engaging in the type of retroactive rulemaking at issue in this case.

## I.

The Secretary contends that the proper standard of review of the district court's remand order is that of abuse of discretion; however, we find that standard inapposite under the facts of this case. Under the controlling statutory provision, 42 U.S.C. § 1395*oo* (f)(1), a provider is entitled to obtain expedited judicial review of any action "which involves a question of law or regulations relevant to the matters

---

**2.** In issuing *Cumberland,* we joined seven other circuits in invalidating the 1979 Malpractice Rule. *See also Bedford County Memorial Hospital v. HHS,* 769 F.2d 1017 (4th Cir.1985); *Menorah Medical Center v. Heckler,* 768 F.2d 292 (8th Cir.1985); *Desoto General Hospital v. Heckler,* 766 F.2d 182, as amended at 776 F.2d 115 (5th Cir.1985); *Lloyd Noland Hospital and Clinic v. Heckler,* 762 F.2d 1561 (11th Cir.1985); *St.*

*James Hospital v. Heckler,* 760 F.2d 1460 (7th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 229, 88 L.Ed.2d 228 (1985); *Humana of Aurora, Inc. v. Heckler,* 753 F.2d 1579 (10th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 180, 88 L.Ed.2d 149 (1985); *Abington Memorial Hospital v. Heckler,* 750 F.2d 242 (3d Cir.1984), *cert. denied,* — U.S. —, 106 S.Ct. 180, 88 L.Ed.2d 149 (1985).

in controversy whenever the Board determines ... that it is without authority to decide the question...." *Id.* 42 C.F.R. § 405.1842 sets forth the applicable procedures for obtaining such final decision of the Board as to the scope of its authority. The hospitals received their letter granting expedited judicial review on January 28, 1983. This letter constitutes a determination by the PRRB that the contested issue involves a question of law which is beyond its statutory authority. The decision of whether to grant retroactive force to a newly promulgated agency rule is a question of law for the courts, with no overriding obligation of deference to the agency decision. *Retail, Wholesale and Department Store Union v. NLRB*, 466 F.2d 380, 390 (D.C.Cir.1972). *See also Daughters of Miriam Center for the Aged v. Mathews*, 590 F.2d 1250, 1259 (3d Cir.1978) ("the administrative agency here has no particular expertise concerning the issue of retroactivity. To the contrary, the extent to which retroactive effect may be given to a promulgation is governed by principles of law that have been developed and refined by the courts, primarily in the context of constitutional adjudication.") Case law includes numerous examples where a court reviewed the validity of a new law or regulation promulgated during the pendency of litigation concerning its predecessor. *Bradley v. Richmond School Board*, 416 U.S. 696, 709, 94 S.Ct. 2006, 2015, 40 L.Ed.2d 476 (1974) (court of appeals did not remand but "heard argument as to the applicability of [a law passed after the district court decided the case] to this and other litigation"); *Harper Grace Hospitals v. Schweicker*, 691 F.2d 808 (6th Cir.1982), *reh'g denied*, 708 F.2d 199 (1983) (court determined whether amendment to Medicare Act during pendency of appeal was applicable). Accordingly, we see no reason to remand this case to the PRRB, the Secretary, or to the district court for resolution of this issue.

## II.

We begin our analysis by noting that we are dealing here with an agency rule promulgated pursuant to the notice and comment procedures of § 553 of the APA. Under that Act, a "rule" is defined as "the whole or part of an agency statement of general or particular applicability and *future effect....*" 5 U.S.C. § 551(4) (emphasis added). Further, the legislative history of the 1972 amendments to the Medicare Act authorizing the Secretary to establish cost limits reveals Congressional intent that such limits be "exercised on a prospective, rather than retrospective, basis so that the provider would know in advance the limits to Government recognition of incurred costs and have the opportunity to act to avoid costs that are not reimbursable." H.R.Rep. No. 231, 92d Cong., 1st Sess. 83 (1971); S.Rep. No. 1230, 92d Cong., 2d Sess. 188 (1972), U.S.Code & Admin.News 1972, pp. 4989, 5070. In addition, the Secretary's own regulation regarding the limits on cost reimbursements states that *"[p]rior to the beginning of a cost period to which revised limits will be applied,* HCFA [Health Care Financing Administration] will publish a notice in the Federal Register, establishing cost limits and explaining the basis on which they were calculated." 42 C.F.R. § 405.460(b)(3) (1985) (emphasis added).

None of the parties to this case challenge the fact that the determination of reimbursable costs under the Medicare Act involves "substantive" rulemaking by the agency, and as such, must be issued in conformity with the procedures set forth in the APA.[3] However, agencies are also empowered to issue "interpretive" rules pursuant to the quasi-judicial process of hearings conducted in individual cases. Gener-

---

**3.** We note that Medicare, as a benefit program, is specifically excluded from the procedural requirements of the APA, 5 U.S.C. § 553(a)(2). *See Humana of South Carolina v. Califano*, 590 F.2d 1070, 1082–84 (D.C.Cir.1978). However, the Secretary expressly waived the § 553(a)(2) exemption in 1971. *See* 36 Fed.Reg. 2531 (1971). Therefore, substantive regulations issued subsequent to 1971 must comply with the APA's notice and comment procedures.

ally, such quasi-judicial rulemaking is accorded deference by the courts in view of the necessity that an agency be capable of responding with flexibility to unforeseeable specialized problems as they arise. *See SEC v. Chenery Corp.*, 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947) (upholding retroactive clarification of uncertain law through adjudication). The Supreme Court in *Chenery* also admonished, however, that since an agency has "the ability to make new law *prospectively* through the exercise of its rule-making powers, ... [t]he function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules *to be applied in the future.*" *Id.* at 202, 67 S.Ct. at 1580 (emphasis added).[4] As aptly noted by K.C. Davis in his Administrative Law Treatise:

> A basic distinction must be recognized between (1) new applications of law, clarifications, and additions, and (2) substitution of new law for old law that was reasonably clear. The first is natural, normal, and necessary. The second raises problems of fairness to those who have relied on the old law.

*Id.*, § 20:7 at 23 (1983). Therefore, we note that an agency attempting to promulgate a rule pursuant to APA procedures bears a heavy burden in justifying retroactivity in view of the Act's goal of assuring that new rules be of prospective application only.

### III.

The Secretary relies on two provisions of the Medicare Act for his authority to promulgate retroactive rules. The first of these, 42 U.S.C. § 1395hh, authorizes the Secretary to "prescribe such regulations as may be necessary to carry out the administration" of the Medicare program. The second, 42 U.S.C. § 1395x(v)(1)(A), which

directs the Secretary to promulgate regulations establishing methods for determining the reasonable cost of covered services, explicitly provides that such regulations shall "provide for the making of suitable *retroactive* corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive." 42 U.S.C. § 1395x(v)(1)(A)(ii) (emphasis added). With regard to this second provision, the Secretary argues that the plain language of the statute, allowing him to make retroactive corrections *for any fiscal period*, necessarily vests him with the power to determine not only the appropriate change in the reimbursement formula but the permissible period of retroactive application as well. Adoption of the construction urged by the Secretary would result in his ability to use unfettered discretion in enacting regulations that give retroactive effect to any or every change that is made in the formulas for determining reimbursable costs. Moreover, although it has not occurred to date in this case, it would also result in the Secretary's ability to re-promulgate successive corrective rules with retroactive application to the date of the initial invalidated rule should subsequent attempts at rulemaking likewise be invalidated.

The Secretary's contentions in this regard are clearly contradicted by a statement made during the hearings on this section by Robert M. Ball, then Commissioner of Social Security:

> It would hardly seem reasonable at the end of the year, after hospitals had entered into an agreement with you on the basis of certain principles, to shift all the principles for retroactive settlement in

---

**4.** The Court of Appeals for the District of Columbia Circuit, facing the problem of whether to give retroactive effect to a new rule announced in the course of agency *adjudication*, observed that this was "a difficult and recurring problem in the field of administrative law. It has arisen with notable frequency in the review of decisions by the (NLRB). *In order to establish an alternative procedure where inequity may*

*be avoided*, the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, has authorized agencies to conduct formal rule making proceedings, in which all interested parties are notified, hearings conducted, and new rules thereby adopted." *Retail, Wholesale and Department Store Union v. NLRB*, 466 F.2d 380, 388 (D.C.Cir. 1972).

terms of how you compute a cost. I don't think that that was contemplated at all.

Reimbursement Guidelines for Medicare, Hearings before the Senate Committee on Finance, 89th Cong.2d Sess. 119 (1966). *See Daughters of Miriam Center,* 590 F.2d at 1258–59 n. 23. Whatever the exact scope of the authority for retroactive correction conferred upon the agency by this second provision, it would fly in the face of settled principles of judicial review to permit an agency to be the sole determiner of the retroactive effect of its own pronouncements, particularly those governed by the safeguards of prospectivity embodied in the APA.

Further, we note that the cases cited by the Secretary in support of his proposition of unlimited authority for retroactive rulemaking all involved a regulation providing for recapture of accelerated depreciation. *Tennessee v. Califano,* 631 F.2d 89 (6th Cir.1980); *Fairfax Nursing Center v. Califano,* 590 F.2d 1297 (4th Cir.1979); *Adams Nursing Home v. Mathews,* 548 F.2d 1077 (1st Cir.1977); *Springdale Convalescent Center v. Mathews,* 545 F.2d 943 (5th Cir. 1977); *Hazelwood Clinic and Convalescent Hospital, Inc. v. Weinberger,* 543 F.2d 703 (9th Cir.1976), *vacated and remanded on other grounds,* 430 U.S. 952, 97 S.Ct. 1595, 51 L.Ed.2d 801 (1977). The Secretary had previously reimbursed providers based on accelerated depreciation. The recapture regulation stated that in the future providers would be reimbursed on a straight-line basis. The only retroactive aspect of the regulation was that if the provider ceased participation in the Medicare program, or if its Medicare utilization dropped substantially after the six-month grace period following the date of promulgation of the regulation, then the provider's depreciation expense for periods prior to the regulation's promulgation would be recomputed on a straight-line basis, result-

ing in a recapture of the accelerated portion.

The recapture regulation was predominantly prospective in nature because it allowed a provider a six-month grace period after the regulation was promulgated to withdraw from the Medicare program and thereby retain the accelerated depreciation payments made to it. Only providers who voluntarily remained in the Medicare program after the grace period would be subject to the recapture. For this reason, the regulation was held to have "limited and reasonable" retroactive effects. *Hazelwood,* 543 F.2d at 708. However, even this limited retroactive regulation was invalidated in part by the Third Circuit Court of Appeals in *Daughters of Miriam Center* which held that retroactive application was beyond the statutory authority of the Secretary to the extent the drop in utilization was beyond the control of the provider. The court reasoned that retroactivity is not permissible where the provider did not have an opportunity to voluntarily avoid retroactive application of the regulation.

■ We conclude from the statutory language that the Secretary is authorized to promulgate some limited rules of retroactive effect when necessary to fulfill the statutory scheme he is charged with implementing. However, in assessing the permissible scope of such rulemaking, we are mindful of the Supreme Court's directive that the "law should avoid retroactivity as much as possible," and that it should be permitted only to avert "the added mischief of producing a result contrary to the statutory design." *Addison v. Holly Hill Fruit Products, Inc.,* 322 U.S. 607, 619–20, 64 S.Ct. 1215, 1222, 88 L.Ed. 1488 (1944).[5] In general, retroactive rulemaking should be upheld only "when the public interest in retroactively curing the defect outweighs the harm to private interests resulting from invalid first instance rulemaking."

**5.** "[R]etroactivity must be balanced against the mischief of producing a result which is contrary to the statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law." *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1581, 91 L.Ed. 1995 (1947).

*Bedford County Memorial Hospital v. HHS*, 769 F.2d 1017, 1024 (4th Cir.1985) (refusing remand for further rulemaking after invalidating the 1979 Malpractice Rule).

## IV.

In assessing the extent of retroactive effect, if any, to be accorded to agency rulemaking, the case of *Retail, Wholesale and Department Store Union v. NLRB*, 466 F.2d 380 (D.C.Cir.1972), acts as a bellwether in setting forth the appropriate considerations for resolution of the problem.[6] However, that case arose in the context of an agency's initial attempt to apply an interpretive quasi-judicial pronouncement to employers who had relied on prior NLRB interpretation. Therefore, some of the factors articulated by the *Retail Union* court are of diminished importance in the instant case involving an agency's quasi-legislative promulgation of a rule to replace a previously invalidated regulation.

In ascertaining the appropriate considerations relevant to the case at bar, a review of two cases involving the repromulgation of identical replacement regulations following court invalidation of their predecessors is instructive. The first of these, *Mobil Oil Corp. v. Department of Energy*, 678 F.2d 1083 (Temp.Emer.Ct.App.1982) (*Mobil III*), involved an attempt by the DOE in 1981 to repromulgate a rule originally enacted as an amendment by the agency and without notice and comment procedures specified by the APA. The court had previously struck down the rule as arbitrary and capricious as well as procedurally invalid for failure to comply with the requirements of the APA, 5 U.S.C. § 553. *Mobil Oil Corp. v. Dept. of Energy*, 610 F.2d 796 (Temp. Emer.Ct.App.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (*Mobil I*). Stating that an agency's authority to issue retroactive rules "is even more limited when the rule promulgated has previously been invalidated by a court," the court explained that the test is a stringent one: "Was the 1981 repromulgation of the 1974 amendment necessary to fulfill a statutory design, or would the failure to give retroactive effect to the 1981 amendment 'do violence to the law as Congress wrote it?'" *Mobil III*, 678 F.2d at 1088, 1090 (citation omitted). The court specifically noted that invalidation of the original amendment had created a regulatory gap in the statutory scheme, but that this resulted from "the DOE's oversight in not changing the cost-allocation regulation in time." *Mobil I*, 610 F.2d at 799, 803, n. 8. They concluded that this gap did not necessarily "do violence to the law" and held the retroactive repromulgation of the 1974 amendment invalid.

The second case involved an attempt by the Secretary of Health and Human Services to retroactively repromulgate a wage index rule invalidated by the court in 1983. In *Georgetown University Hospital v. Bowen*, Medicare & Medicaid Guide (CCH) ¶ 35,341 (D.D.C. April 11, 1986), *appeal pending*, No. 86–5381 (D.C.Cir.1986), the district court denied retroactive application to the 1984 repromulgation of the identical invalidated wage index which the Secretary had attempted to apply to cost reporting periods from 1981 on. The 1981 wage index had been invalidated because it was promulgated without the required notice and comment procedures. *District of Columbia Hospital Association (DCHA) v. Heckler*, No. 82–2520, slip op. (D.D.C. April 29, 1983). While the court questioned whether the Secretary was even *authorized* to engage in such retroactive repromulgations under the governing statute or the APA, it declined to rest summary judg-

---

**6.** Among the considerations that enter into a resolution of the problem are (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Retail Union*, 466 F.2d at 390.

ment on that basis alone. Therefore, the court considered the question of retroactivity under the five factors set forth in *Retail Union*, placing greatest emphasis on the fifth factor: whether any statutory interest supported retroactive application.

In conducting this inquiry, the court assessed both the procedural and substantive aspects of the 1984 repromulgation in finding that application of the reissued wage index to the plaintiffs would have resulted in under-reimbursement of legitimate costs. The court further noted that no comments had expressed favor for retroactive recoupment of funds from the providers, and therefore "[s]uch action in the face of comments opposed to it suggests that the notice and comment 'procedural correction' was in critical respects simply *pro forma*. Such is the stuff of which arbitrary and capricious decisions are made." *Georgetown*, Medicare & Medicaid Guide, *supra*, at 10,697. Finally, the court also explained that the ill effects of retroactive application "are substantial for these plaintiffs and *for the general integrity of the administrative rule-making process*." *Id.* (emphasis added).

■■■ Reviewing these two cases, we find that different considerations predominate when an agency promulgates interstitial, "gap-filling" regulations or announces quasi-judicial interpretations which serve to clarify previously uncertain or contradictory practices and when the agency attempts to retroactively repromulgate a previously invalidated rule which affects a substantial change in settled practice. Application of the *Retail Union* factors to the former case is appropriate, since those factors tend to stress the extent of detrimental reliance or opportunity for altered

conduct by the affected party in situations where justifiable reliance is often questionable. However, we find it more appropriate to place the burden of justification upon the agency when it attempts to utilize its quasi-legislative powers pursuant to the APA, an Act which was intended to *resolve* problems of retroactivity, to promulgate a rule with not only incidental retroactive *effects* but with a lengthy, stated retroactive period of *application* as well.[7]

Therefore, we find the following factors relevant to our assessment of the Department of Health and Human Services' promulgation of the 1986 Rule applicable retroactively, by its terms, to cost reporting periods beginning in 1979:

1. the degree of capriciousness or abuse of discretion exhibited by the agency in the promulgation of the initial rule;

2. the existence and duration of a prior settled regulation or practice, and the extent to which the initial invalidated rule constituted a substantial change in such settled practice; and,

3. the extent to which the change embodied in the initial invalidated rule was integral to the effectuation of the statutory purpose.

## V.

It remains only to apply the foregoing considerations to the facts of the case at bar. In so doing, we note that our standard of review is governed by 5 U.S.C. § 706(2) of the APA. That section mandates that a reviewing court shall:

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

---

7. We observe that the effects of the 1986 Malpractice Rule are almost exclusively retroactive due to the fact that, in 1983, Medicare implemented a prospective payment system whereby hospitals are reimbursed on the basis of predetermined charges rather than actual costs incurred. *See generally, Washington Hospital Center v. Bowen*, 795 F.2d 139, 141–42 (D.C.Cir.

1986) (contrasting the prospective payment system with the pre–1983 reasonable cost method of reimbursement). Since the vast majority of participating hospitals are now reimbursed under this new system, the prospective effects of the 1986 Rule are confined to the relatively small number of hospitals which are still being reimbursed on a costs-incurred basis.

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law; . . . .

The issue of retroactivity implicates the constitutional right to due process of law, and we therefore review under § 706(2)(B).

With regard to the first factor, we note that the Secretary no longer contests the validity of the 1979 Rule. Brief for Appellee at 2. Moreover, several comments by the district court in *Mt. Carmel Mercy Hospital v. Heckler*, 581 F.Supp. 1311 (E.D.Mich.1983), whose reasoning was adopted by this court in *Cumberland*, indicate a finding of substantial abuse of discretion by the Secretary in promulgating the 1979 Rule. Statements such as "[i]t is inconceivable how the Secretary can suddenly determine that malpractice costs are direct costs," *id.* at 1315, "it is extremely difficult to comprehend how the Westat study is support for the novel conclusion that malpractice insurance premiums should be ignored," *id.* at 1317, and "the regulation was not really attempting to realistically handle malpractice insurance costs in a fair manner," *id.* at 1319, indicate that the 1979 Rule was promulgated in a highly arbitrary manner. Similarly, the Secretary's promulgation and unrelenting support of a regulation characterized by various other courts as "a clear error in judgment," "without rational support," "likely to lead to unfair and illogical results," and a "slipshod approach," weigh heavily against the agency. *See Humana of Aurora, Inc. v. Heckler*, 753 F.2d 1579, 1583 (10th Cir.1985); *Menorah Medical Center v. Heckler*, 768 F.2d 292, 296 (8th Cir.1985); *Bedford County Memorial Hospital v. HHS*, 769 F.2d 1017, 1023 (4th Cir.1985); *Metropolitan Hospital, Inc. v. Heckler*, No. C–83–502–A (N.D.Ga. June 25, 1984).

Regarding the second factor, we observe that, prior to the promulgation of the 1979 Rule, the prior method of reimbursement based on the number of hospital utilization days consumed by Medicare patients had been in effect since the enactment of the Medicare Act in 1966. In fact, this utilization method was used to determine reimbursement for every other category of overhead costs for the previous thirteen years. No regulatory gap was created by the 1979 Rule's invalidation, since this court and others held that the prior utilization method was "reinstated until *validly* rescinded or replaced." *Cumberland*, 781 F.2d at 538. (emphasis added) Finally, we observe that both parties agree that the 1979 Rule mandated a substantial change in the method of reimbursement from the percentage of Medicare patient utilization method to one involving a "claims paid" formula by which malpractice premium costs were totally segregated from the general and administrative (G & A) pool which contained all sums representing overhead costs of hospital administration. Although the Secretary insisted that this exceptional treatment for malpractice premiums was warranted by the Westat study (the report upon which the Secretary relied in promulgating the 1979 Rule), this court as well as others which invalidated that Rule found that the Secretary's report failed to establish that malpractice costs require treatment separate from other G & A costs. *Mt. Carmel*, 581 F.Supp. at 1316, *aff'd* in *Cumberland*.

Next, we assess the necessity of the change sought by the Secretary to the furtherance of the statutory purpose. In this regard, the Medicare program evinces twin statutory interests: the reimbursement of only those costs necessary in the efficient delivery of services, and the prevention of cost shifting from Medicare to non-Medicare patients. 42 U.S.C. § 1395x(v)(1)(A). The Secretary has consistently followed a policy of pooling all overhead (G & A) costs

and reimbursing them on the basis of the provider's Medicare patient utilization ratio. This regulatory scheme was based on the assumption that some costs would be disproportionately allocated in favor of Medicare patients while others would be disproportionately allocated in favor of non-Medicare patients. However, it was believed that the end result of this pooling would be a fair allocation of indirect costs so that neither the Medicare nor the non-Medicare sector impermissibly paid the costs of the other. The Secretary's removal of malpractice premiums from the G & A pool via the promulgation of the 1979 Rule was based on two findings: first, the cost of malpractice insurance skyrocketed during the 1970's and, second, the Westat study led the Secretary to believe that Medicare was paying more than its fair share of those costs. *See* 44 Fed.Reg. 31,-642 (June 1, 1979).

In striking down the 1979 Rule, the Seventh Circuit in *St. James Hospital v. Heckler,* 760 F.2d 1460, 1471 (7th Cir.1985), observed that:

> Even assuming that Medicare paid a disproportionate amount of malpractice insurance costs when they were included in the G & A pool, the Secretary seems to have forgotten that the G & A pool was designed to accommodate such imbalances. What is missing in the Secretary's promulgation of the Malpractice Rule is the necessary starting premise: that the G & A pool including malpractice insurance costs, taken as a whole, impermissibly shifted costs attributable to non-Medicare patients to the Medicare program.

Further, the court found that "[t]he Secretary's action in removing malpractice insurance costs from the G & A pool is particularly suspect in light of the agency's longstanding resistance to providers' attempts to isolate other costs disproportionately attributable to Medicare and thus under-reim-

bursed under the pooling system." *See id.* (citing cases involving PRRB refusal to allow "discrete" costing). In addition, the district court in *Mt. Carmel* cited an internal memorandum by the Director of Reimbursement Policy for the Medicare Bureau which indicated that one study actually supported the conclusion that the Secretary was inadequately reimbursing G & A costs under the pooling system and, further, that "the Health Care Financing Administrator noted that all the savings from the malpractice rule would be lost if Medicare reimbursed all costs on a discrete unit basis." *Mt. Carmel,* 581 F.Supp. at 1318.

Based on the foregoing, we cannot find that the change which the Secretary attempted to impose via the 1979 Rule was essential to the effectuation of the statutory purpose. In this context, we note that the 1986 repromulgated rule is not identical to the invalidated 1979 Rule. Under the 1986 Rule,[8] total malpractice insurance premium costs (including self-insurance fund contributions), are divided into two components. The "administrative component," which accounts for 8.5% of total premium cost, is included in the G & A pool and is apportioned on the basis of the individual hospital's Medicare utilization rate. 51 Fed.Reg. 11,144–45. The Secretary determined that because the subcosts that constitute the administrative component are at most only slightly affected by the frequency and amount of malpractice claims, that portion of total premium cost is properly apportioned on a utilization basis. *Id.* at 11,145.

The "risk component"—accounting for insurer expenses that are directly related to insurance risks—comprises the remaining 91.5% of total premium cost. *Id.* The risk component is apportioned on the basis of a "scaling factor formula" that takes into account the individual hospital's utilization rate, and both the national Medicare malpractice loss ratio (as adjusted to

---

**8.** Effective October 1, 1986, the interim final 1986 Rule was finalized and redesignated from

42 C.F.R. § 405.457 to 42 C.F.R. § 413.56. 51 Fed.Reg. 34,790 and 34,808–09 (Sept. 30, 1986).

account for associated claims handling costs) and the national Medicare utilization rate. *Id.* The Secretary determined that because the subcosts that constitute the risk component are significantly affected by the frequency and amount of malpractice claims, that portion of total premium cost is properly apportioned on the special basis established by the 1986 Rule. *Id.*

Therefore, although 8.5% of premium costs have been returned to the G & A pool for reimbursement under the pre–1979 method, 91.5% of premiums remain segregated for special treatment similar but not identical to that of the 1979 Rule. This formula is sufficiently analogous to that of the 1979 Rule to constitute a substantial departure from the prior utilization method, raising serious due process concerns with its retroactive application.[9]

We are mindful of the fact that special circumstances obtain in cases involving public programs, such as Medicare, where the allocation of limited Trust Fund resources are at stake. We also acknowledge that the failure of the data used in 1979 to justify the Secretary's attempt to alter his method of malpractice premium reimbursement does not preclude the possibility that the Medicare program *is* over-reimbursing hospitals for their malpractice premiums. If such was the case, the Secretary remained free to develop such data at any time to support a future change in his reimbursement formula. Further, we do not hold that *any* retroactive application of a rule or regulation is *per se* invalid. How-

ever, we also recognize the countervailing policy that retroactivity is disfavored in the law because it "interfere(s) with the legally-induced and settled expectations of private parties"[10] and, in the context of administrative rulemaking, it trivializes the procedures mandated by the Administrative Procedure Act.

We emphasize that in denying retroactive effect to the 1986 Rule, we express no opinion on its procedural or substantive validity as prospectively applied. Our decision today leaves intact our holding in *Cumberland* that the prior utilization method is to be applied to hospital cost reports prior to May 1, 1986.

The decision of the district court insofar as it invalidates the 1979 Malpractice Rule is AFFIRMED. However, that portion of the district court's decision ordering remand to the PRRB for application of the 1986 Rule is REVERSED and the case is REMANDED to the district court for award of the amounts due, plus interest, in accordance with this opinion.

---

**9.** In the proper case, it may also be appropriate to consider both the existence or degree of any appearance of agency abuse of discretion in the procedural promulgation of a replacement rule and the extent to which the repromulgated rule differs substantively from the invalidated rule. However, we decline in this case to address the issues of the procedural or substantive validity of the 1986 Rule for two reasons. First, the district court did not have an opportunity to pass upon this question since this regulation was not finalized at the time of its decision. Second, the 1986 Rule has not been applied to any of the providers in this suit; therefore, no

final decision of the PRRB with respect to this rule has yet been issued.

**10.** *Daughters of Miriam Center*, 590 F.2d at 1260. *See* Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 Harv.L.Rev. 692 (1960). Although Hochman observes that retroactive rules are often upheld because the "interest in the retroactive curing of such a defect in the administration of government outweighs the individual's interest in benefiting from the defect," we point out that the Secretary failed to establish that the 1979 Rule corrected any "defect" in his prior reimbursement formula.